# IN THE SUPREME COURT, STATE OF WYOMING

## 2013 WY 20

### OCTOBER TERM, A.D. 2012

### February 20, 2013

IN THE MATTER OF THE GUARDIANSHIP OF
LNP, A Minor Child:

KC,

Appellant
(Respondent),

v.

CC and EC,

Appellees
(Petitioners).

No. S-12-0155

*Appeal from the District Court of Laramie County*
*The Honorable Michael Davis, Judge*

*Representing Appellant:*

John M. Burman, Director, and Christopher Sherwood, Student Intern, University of Wyoming, College of Law Legal Services Program. Argument by Mr. Sherwood.

*Representing Appellees:*

Aaron J. Lyttle, Long, Reimer, Winegar, Beppler, LLP, Cheyenne, Wyoming. Argument by Mr. Lyttle.

*Before KITE, C.J., HILL, VOIGT, BURKE, JJ., and GOLDEN, J., Retired.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BURKE, Justice.**

[¶1]    Appellant, KC, ("Mother"), challenges the district court's decision to appoint CC and his wife, EC, ("Grandparents"), as permanent guardians for Mother's daughter, LNP. Mother contends the guardianship proceedings were subject to the requirements of the Indian Child Welfare Act (ICWA), and that the district court violated the provisions of the Act in establishing a plenary guardianship. Mother also contends the district court erred in concluding, under the ICWA, that returning LNP to Mother would likely result in serious emotional or physical damage. We affirm.

## *ISSUES*

[¶2]   Mother presents the following issues:

1. Whether the district court failed to comply with the Indian Child Welfare Act's ten day notice requirement.

2. Whether the district court received testimony from a "qualified expert witness" as required by the Indian Child Welfare Act.

3. Whether the district court received clear and convincing evidence that shows LNP's return to the Appellant would likely result in serious emotional or physical damage as required by the Indian Child Welfare Act.

Grandparents state the issues in a substantially similar manner.

## *FACTS*

[¶3]    Appellant is the mother of LNP, who was born in Oklahoma in 2006.[1]  During the summer of 2010, Grandparents travelled to Oklahoma to attend the funeral of a family member. Mother told Grandparents that she was struggling to make ends meet and was having trouble finding shelter for herself, LNP, and her two other children. Grandparents offered to let LNP live with them in Cheyenne, and Mother agreed.

[¶4]   LNP began living with Grandparents in September, 2010.  On September 8,

---

[1] LNP's father has had no contact with LNP for several years and did not participate in the guardianship proceedings.

Mother executed a handwritten letter consenting to Grandparents' "guardianship over" LNP. The letter stated that "I [KC] give permission to [Grandparents'] guardianship over my daughter [LNP] while I'm away. For Schooling, Medical Assi[s]tance, Emergency Assi[s]tance or any other things that needs [sic] to be done while I'm away." When LNP came into Grandparents' care she was underweight and was "sick all the time." Grandparents also discovered welts on LNP's buttocks, which turned out to be symptoms of impetigo.

[¶5]   Soon after taking LNP into their care, Grandparents became concerned by LNP's behavior. LNP had nightmares and a hard time sleeping in her bed. She often chose to sleep on the floor. LNP was visibly afraid of men and exhibited sexualized behavior. Eventually, LNP told Grandparents that she had been "honeyed" by her "mean daddy" while in Mother's care. In response, Grandparents sought professional counseling services for LNP. Sherri Rubeck, a licensed professional counselor, diagnosed LNP with disruptive behavior disorder and concluded that she had been sexually abused.

[¶6]   On June 17, 2011, Grandparents filed a Petition for the Appointment of Emergency Temporary Guardians in Laramie County District Court, seeking temporary guardianship of LNP. Grandparents attached Mother's handwritten consent to the guardianship. The court issued an ex parte order granting Grandparents' petition and set the matter for hearing on June 22. After holding a hearing, the court issued an order appointing Grandparents as temporary guardians of LNP.

[¶7]   On September 30, 2011, Grandparents filed a motion to convert the temporary guardianship to a plenary guardianship, asserting that a plenary guardianship was in the best interests of LNP. Grandparents attached a "Consent to Appointment of Guardian," which was signed by Mother on June 25. Two weeks later, Mother filed a motion to terminate the temporary guardianship. She also objected to the conversion of the temporary guardianship to a plenary guardianship. The motions were set for hearing on November 29, 2011.

[¶8]   On November 21, eight days before the scheduled hearing, Mother filed a motion to vacate the temporary guardianship, alleging that LNP was an "Indian child" as defined by the Indian Child Welfare Act (ICWA), and asserting that the court had failed to comply with the provisions of the Act in granting the temporary guardianship. The motion stated that the court's temporary guardianship order had failed to make a finding, supported by the testimony of a qualified expert witness, that Mother's custody of LNP was likely to result in serious emotional or physical damage to LNP, as required under Section 1912(e) of the ICWA. At the beginning of the hearing on November 29, the court addressed Mother's motion to vacate and decided that it would consider the applicability of the ICWA at that hearing. The court proceeded to receive testimony from Mother, Grandparents, LNP's counselor, and various individuals acquainted with Mother and LNP.

[¶9]   Evidence introduced at the hearing indicated that LNP may have descended from a Cherokee ancestor.  As a result, the court ordered Grandparents to provide notice of the proceedings to the Cherokee Nation and the Bureau of Indian Affairs.  In response to Mother's claim that adequate notice had not been given in accordance with the ICWA, the district court did not close the record at the hearing.  The court stated that it would permit receipt of additional evidence if the Cherokee Nation decided to intervene.  The court continued the temporary guardianship pending notification from the Cherokee Nation as to whether LNP was, in their view, an Indian child under the ICWA.  The court noted that it would refrain from issuing a final decision until the tribe had a chance to respond.

[¶10]  On January 23, the Cherokee Nation issued a letter stating that LNP had been determined to be an Indian child as defined under the ICWA.  The letter noted that the tribe "will be staffing this case to determine what action, if any, will be taken in this matter."  At a status hearing on January 25, 2012, the court asked Mother whether she would prefer that the court issue a decision as to guardianship of LNP, or whether she would prefer to wait to see if the Cherokee Nation would intervene.  Mother stated that she preferred to wait, and the court continued the temporary guardianship pending further input from the Cherokee Nation.

[¶11]  At a subsequent status hearing on February 29, the court was advised by the parties that the Cherokee Nation had decided not to intervene or take other action relating to the case, and that the matter was ripe for decision.  The district court issued an opinion and order concluding that Mother was unfit to parent under Wyo. Stat. Ann. § 3-2-104(b), based on the evidence presented at the hearing held on November 29.  The district court also determined, pursuant to Section 1912(e) of the ICWA, that returning LNP to Mother was "likely to cause serious emotional damage to L.N.P."  The court entered an order granting the guardianship petition and denying Mother's motion to terminate the guardianship.  The court noted, however, that "Both Wyoming law and the ICWA contemplate that a guardianship under these circumstances should continue only so long as necessary to prevent further harm to L.N.P., and that the guardianship must end if there is no longer risk of serious emotional harm."  Mother appeals the district court's order.

## DISCUSSION

### I. Notice of Guardianship Hearing under ICWA § 1912(a)

[¶12]  In Mother's first issue, she claims Grandparents did not provide the ten-day notice of the guardianship hearing to LNP's Indian tribe in compliance with the requirements of the Indian Child Welfare Act.  She contends that the failure to provide adequate notice constitutes reversible error, and requests that this Court terminate  the  guardianship.

3

Grandparents do not dispute that LNP is an "Indian child" as defined under the ICWA.[2] They contend, however, that the ICWA's notice requirement was not triggered because the district court did not "know or have reason to know" that LNP was an "Indian child" at the time of the November 29 hearing. They assert that the district court "had no reliable evidence that LNP was an Indian child before the hearing." Grandparents further contend that, even if notice was required, the failure to provide such notice constitutes harmless error.

[¶13] The relevant provision of the Indian Child Welfare Act provides as follows:

> **§ 1912. Pending court proceedings**
>
> **(a) Notice; time for commencement of proceedings; additional time for preparation.** In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe. No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary: *Provided*, That the parent or Indian custodian or the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding.

25 U.S.C. § 1912(a) (emphasis in original). The Bureau of Indian Affairs, the agency charged with the responsibility to implement the ICWA, has issued "Guidelines for State Courts; Indian Child Custody Proceedings," representing the Interior Department's interpretation of certain provisions of the Act. 44 Fed. Reg. 67,584 *et seq*. (Nov. 26, 1979). Although the BIA Guidelines note that they do not have "binding legislative

---

[2] The ICWA defines an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 USC § 1903(4).

effect," the Guidelines state that an administrative interpretation of statutory language is given "important but not controlling significance." *Id.* (citing *Batterton v. Francis*, 432 U.S. 416, 424-25, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977)). With respect to the notice requirements of the Act, the BIA Guidelines provide that a state court "has reason to believe a child involved in a child custody proceeding is an Indian" in five nonexclusive circumstances. The first circumstance identified in the Guidelines is satisfied when "Any party to the case, Indian tribe, Indian organization or public or private agency informs the court that the child is an Indian child." 44 Fed. Reg. 67,586.

[¶14] In Mother's petition to vacate the temporary guardianship, Mother asserted that "The minor child is an Indian child because she is unmarried, under 18, and based on the information and belief of [Mother], is a member of the Cherokee Nation due to the listing of a linear ancestor of the minor child on the Dawes Commission Rolls." Consistent with the BIA Guidelines, we find that this communication was sufficient to give the district court "reason to know" that LNP was an Indian child under the ICWA, thereby triggering the notice requirement contained in Section 1912(a) of the Act. Accordingly, despite Mother's late assertions of LNP's Indian heritage, we find the district court erred by failing to require that adequate notice be provided to the Cherokee Nation prior to the guardianship hearing. However, we are unable to discern any harm Mother may have suffered as a result of the error.

[¶15] In order to warrant reversal, an error must be injurious or prejudicial to the appellant. *Spilman v. State*, 633 P.2d 183, 185 (Wyo. 1981). Pursuant to W.R.A.P. 9.04, "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded by the reviewing court." The burden of establishing that an error is prejudicial rests with the appellant. *In re Claim of Taffner*, 821 P.2d 103, 107 (Wyo. 1991). Although this Court has not had the opportunity to apply W.R.A.P. 9.04 to ICWA's notice requirement, we have previously held that notice which is deficient due to untimeliness is subject to review for harmless error. In *Conner v. Board of County Comm'rs*, 2002 WY 148, ¶¶ 15-18, 54 P.3d 1274, 1280-81 (Wyo. 2002), we held that failure to provide timely notice of a show cause hearing pursuant to W.R.C.P. 71.1(e)(1) was error. We noted, however, that the appellants had "not addressed the nature of any harm they may have incurred" and, consequently, we held that the error was harmless. *Id. See also In re Cheyanne F.*, 164 Cal. App. 4th 571, 576-77 (Cal. App. 4th Dist. 2008) (disagreeing with the contention that the "ICWA mandates reversal, without regard to prejudice, if there is any deficiency in the notice given to the tribe or the BIA" and holding that omission of information in notice to the appellant's tribe constituted harmless error). As in *Conner*, we find the deficient notice in this case is subject to review for harmless error.

[¶16] Mother has made no attempt to demonstrate that she was prejudiced by the failure to provide notice prior to the guardianship hearing. At the hearing, the district court acknowledged the ICWA's notice requirement and determined that the Cherokee Nation

5

and the BIA were entitled to notice of the proceedings based on the information presented at the hearing. The court ordered Grandparents to provide such notice, finding that notice was a "prerequisite to reaching the merits of the case." In conjunction with this order, the court held the record open to allow for additional evidence in the event that the tribe decided to intervene. The Cherokee Nation, after determining that LNP qualified for membership in the tribe, ultimately decided not to intervene in the case. In light of these circumstances, we find that the error was harmless.

## II. Testimony of Qualified Expert Witness under ICWA § 1912(e)

[¶17] In her second issue, Mother contends the district court did not receive testimony from a "qualified expert witness" supporting LNP's placement outside of the natural parents' home, as required under the ICWA. The determination of whether a witness qualifies as an expert is vested within the discretion of the trial court and that determination will be overturned only when an abuse of discretion is shown. *Seivewright v. State*, 7 P.3d 24, 31 (Wyo. 2000). In determining whether there has been an abuse of discretion, the ultimate question is whether the court could reasonably have concluded as it did. *DLH v. JLA (In re AMP)*, 2012 WY 132, ¶ 9, 286 P.3d 746, 748 (Wyo. 2012).

[¶18] Mother claims that Ms. Rubeck was not a qualified witness because she "does not have the professional qualifications regarding, experiences or expertise with, or substantial knowledge of Indian children, tribal customs, or Indian childrearing norms and standards, nor did she ever consider the child's ancestry before making her conclusion." Grandparents respond that the tribal customs and prevailing social and cultural norms of the Cherokee Nation have no bearing on the facts of this case. They claim that such knowledge was not required in order to qualify Ms. Rubeck as an expert witness under the ICWA.

[¶19] Section 1912(e) of the ICWA provides that

> No foster care placement may be ordered in [a foster care placement] proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

Mother acknowledges that the ICWA "does not expressly define the qualifications necessary to be considered a qualified expert witness." Nonetheless, she asserts that the ICWA requires "heightened qualifications over those normally required of experts testifying under state statutes."

[¶20] Mother directs our attention to the BIA Guidelines interpreting the Act's

requirement that a court receive testimony from a qualified expert witness. The Guidelines provide as follows:

> D.4. Qualified Expert Witnesses
>
> (a) Removal of an Indian child from his or her family must be based on competent testimony from one or more experts qualified to speak specifically to the issue of whether continued custody by the parents or Indian custodians is likely to result in serious physical or emotional damage to the child.
>
> (b) Persons with the following characteristics are most likely to meet the requirements for a qualified expert witness for purposes of Indian child custody proceedings:
>
>> (i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.
>>
>> (ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.
>>
>> (iii) A professional person having substantial education and experience in the area of his or her specialty.

44 Fed. Reg. 67,593.

[¶21] The district court determined that Ms. Rubeck was a qualified witness, reasoning that "There is no evidence whatsoever that L.N.P. has been raised any differently than any child of a non-Indian family. . . . [Ms. Rubeck] was adequately qualified to offer the opinions she did in this case even though she has not worked extensively with Indian children." We agree with the district court. First, we note that neither the ICWA, nor the relevant BIA Guidelines, require a "qualified expert witness" to possess expertise in tribal customs. Second, we agree with the notion, expressed by other courts that have addressed this issue, that "special knowledge of Indian life is not necessary where a professional person has substantial education and experience and testifies on matters not implicating cultural bias." *Rachelle S. v. Arizona Dep't of Econ. Sec.*, 191 Ariz. 518,

7

520, 958 P.2d 459, 461 (Ariz. Ct. App. 1998); *see also In Interest of C.W.*, 239 Neb. 817, 825, 479 N.W.2d 105, 112 (Neb. 1992) ("Dr. Melton possesses substantial education and experience in his area of specialty, and his lack of experience with the Indian way of life in no way compromised or undermined the value of his testimony. The assignment of error as to the use of his testimony at trial is therefore without merit."); *K.E. v. State (State ex rel. S.A.E.)*, 912 P.2d 1002, 1005 (Utah Ct. App. 1996) ("We note that professionals having substantial education and experience in child welfare might well qualify as expert witnesses under ICWA, even though their experience with Indians is limited.") (citing cases).

[¶22] As noted by the district court, there was no evidence presented at the guardianship hearing relating to Native American customs or childrearing practices, and no evidence indicating that Mother had raised LNP according to such norms or practices. Tribal customs simply had no relevance to the facts of this case. Rather, the decision in this case was based primarily on Mother's inability to provide a stable home for LNP, as well as the likelihood that returning LNP to Mother would trigger future emotional harm as a result of past sexual abuse. We find that the nature of past and potential future harm to LNP indicated in this case transcends cultural norms and values. Because testimony relating to tribal customs was not relevant in assessing the danger to LNP in remaining with Mother, there was no need for the expert to have knowledge of such customs. Accordingly, we find the district court did not abuse its discretion in determining that Ms. Rubeck was a qualified expert witness.

### III.    Likelihood of Serious Emotional or Physical Damage to LNP

[¶23] In its order appointing Grandparents as permanent guardians, the court determined, first, in compliance with Wyoming law, that Mother was not a fit parent. *KO v. LDH (In re MEO)*, 2006 WY 87, ¶ 55, 138 P.3d 1145, 1161 (Wyo. 2006). The court then proceeded to determine that returning LNP to Mother was "likely to cause serious emotional damage to L.N.P." under Section 1912(e) of the ICWA. Mother does not contest the district court's finding of parental unfitness. Rather, Mother claims there was insufficient evidence to establish that LNP would likely be subject to serious physical or emotional harm if she were returned to Mother's care. When reviewing the sufficiency of the evidence, we examine the evidence in the light most favorable to the prevailing party, assume all favorable inferences to be true, and disregard conflicting evidence presented by the unsuccessful party. *ZMETS v. State,* 2012 WY 68, ¶ 8, 276 P.3d 392, 394-95 (Wyo. 2012).

[¶24] Mother contends that Ms. Rubeck provided "no testimony that LNP's return to the Appellant's custody would likely result in any serious emotional or physical damage to LNP," and that Ms. Rubeck was not sufficiently informed to develop an opinion as to the likelihood of future harm to LNP. Mother also claims that police investigations have revealed "no clear proof that any sexual or physical abuse occurred," and she notes that

she no longer has any contact with the alleged abuser.

[¶25] At trial, Grandparents testified without objection that LNP had reported that she had been sexually abused by her "mean daddy" while in Mother's care. LNP told Grandparents that she had been "honeyed" by her "mean daddy," causing her to bleed in her groin area. When CC confronted Mother about LNP's reports of abuse, Mother expressed concern that she would be blamed for the abuse. In her testimony, Mother acknowledged that she suspected LNP's father of abusing LNP after finding blood in LNP's bed. Mother stated, however, that she did not contact the police about the incident, and that she dropped the matter after receiving assurances from the father's family that "he wouldn't do that."

[¶26] Ms. Rubeck testified that LNP's behavior in therapy was consistent with that of a victim of sexual abuse. She noted that LNP was "a very anxious little child, very hypervigilant . . . , very watchful of her surroundings," and that she was angry and aggressive in daycare, hitting and fighting with other children. Ms. Rubeck further testified that LNP would likely regress if she were returned to Mother. Ms. Rubeck stated that "We would probably see more bed wetting, more hitting, more fighting. . . . There would [probably be] flashbacks and some recurrent triggers to her memory that would cause her to act out." According to Ms. Rubeck, LNP feels safe in Grandparents' home and does not want to live with Mother.

[¶27] In addition to the testimony concerning LNP's sexual abuse, the court also received testimony relating to Mother's inability to provide a stable home for LNP. CC testified that Mother had lived with four different men since her relationship with LNP's father had dissolved, and that she had been thrown out of her living quarters by several of these men, leaving her without a place to stay. Mother acknowledged that, before asking Grandparents to take care of LNP, she had placed LNP in the care of a friend for an extended period "because at the time I was not stable." When Grandparents travelled to Oklahoma during the summer before receiving LNP into their care, Mother was living with her boyfriend in a shed behind her boyfriend's parents' house. The shed had no running water, and electricity was provided by an extension cord running to the house.

[¶28] During cross-examination, Mother offered conflicting testimony in response to several different lines of inquiry. For example:

- In response to questioning regarding the suspected sexual abuse of LNP, Mother initially stated that she had never seen any signs of sexual abuse and that she had no reason to think that LNP had been harmed. Mother subsequently acknowledged, however, that she had found blood in LNP's bed and had accused LNP's father of abuse.

9

- When asked about LNP's untreated skin condition, Mother initially stated that she had sought treatment for LNP's impetigo while LNP was in her care, but she later testified that LNP had not been diagnosed with impetigo until LNP was out of her custody.

- In response to questioning about her criminal history, Mother initially denied that she had any criminal background. However, she subsequently stated that "I've been arrested, one for following too close with no license. And then the last one was whenever I hit the old lady in the mouth. That's the only two I've had." Mother explained that she had hit the "old lady," whom she was living with at the time, because she had accused Mother's friend of molesting LNP.

- When asked whether she had ever threatened to commit suicide, an inquiry prompted by E C's testimony, Mother stated that she had not. Mother subsequently admitted she had told her father that she was going to kill herself because she was "stressed out."

Ultimately, the district court found that Mother was not a credible witness. We defer to that finding. *See DLH*, ¶ 20, 286 P.3d at 753.

[¶29] Based on the evidence presented at the guardianship hearing, the district court concluded that LNP would likely suffer serious emotional or physical damage if she was returned to Mother. In its opinion, the district court stated:

> The Court finds by clear and convincing evidence that continued custody by [Mother] is likely to cause serious emotional damage to L.N.P. . . . The record establishes beyond all doubt that L.N.P. has already suffered serious emotional damage as the result of sexual abuse. [Ms. Rubeck] convincingly testified that to return her to her mother, at least at this time, would result in what the Court concludes would also be serious emotional damage. She predicted that the child would regress, with more bedwetting, hitting, fighting. She was concerned about flashbacks and recurrent memory triggers which would cause her to act out. [Mother's] historical inability to provide a stable living

10

environment, and her ever-shifting associations with the men on whom she depends, create a near-certainty of future severe emotional damage to a child who has already suffered far too much.

The Court does not perceive ICWA to require a finding that L.N.P. will suffer such serious damage that she may be emotionally crippled for life before it intervenes. The consequences predicted by [Ms. Rubeck] and those reasonably to be inferred from the evidence are severe enough to allow intervention.

Viewing the evidence in the light most favorable to Grandparents, we find clear and convincing evidence to support the district court's conclusion that returning LNP to Mother's care would likely result in serious physical or emotional damage under Section 1912(e) of the ICWA.

[¶30] Under the same issue heading, Mother devotes a single paragraph of her brief to a claim that Grandparents failed to show that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful," as required under Section 1912(d) of the ICWA. Mother does not provide any citation to relevant legal authority defining or interpreting the "active efforts" requirement in the context of guardianship proceedings or otherwise, and does not suggest any remedial services that should have been, but were not, offered to her. Rather, Mother simply asserts that "no such efforts have been made with or even offered" to her.

[¶31] Mother's failure to provide appropriate context and legal authority to support her claim of error prevents adequate review by this Court on this issue.[3] We would point out, however, that the guardianship proceedings in this case did not result in the permanent breakup of the Indian family, and Grandparents did make active efforts to reunify Mother with LNP. EC testified that they had repeatedly sent Mother money to allow her to purchase food and clothing and to buy gifts for LNP. Mother acknowledged that she had received monetary support from Grandparents, as well as child support from LNP's father. However, she admitted that she had not contributed any money to support LNP while in Grandparents' care, stating that "I have not gave them any money for the fact is I don't want to do it[.]" Grandparents also encouraged Mother's contact with LNP through

---

[3] The guardianship proceedings in this case were initiated by Grandparents, not the State. Mother has offered no authority interpreting the "active efforts" requirement as it relates to the obligations of private parties to provide rehabilitative services.

phone conversations and video chat, but Mother's communications eventually "tapered off." Additionally, CC invited Mother to live with LNP in Cheyenne, and sent money so that she could visit. However, Mother visited LNP only once. Because Mother did not accept invitations to live with Grandparents or visit LNP, she was unable to participate in LNP's counseling sessions with Ms. Rubeck.

[¶32] The district court acknowledged that Mother had viable prospects for rehabilitation, but noted that, as of the time of the hearing, she was unable and unwilling to engage in necessary rehabilitative efforts:

> Nothing in her current behavior demonstrates that [Mother] could not be salvaged as a parent if she would go through the process for family reunification normally followed in abuse-neglect proceedings. The evidence just shows that, at this time, [Mother] has placed L.N.P. in a position which led to horrific abuse, and that she is unwilling to take the steps necessary to protect her in the future and to help her heal. She seems unable to appreciate the importance of the most basic of human needs – to be safe – and that she is currently incapable of providing it to L.N.P. without making some changes in her lifestyle.

Importantly, however, the proceedings in this case did not result in the permanent breakup of the family in the form of a termination of Mother's parental rights. Although the district court determined that Grandparents' guardianship would be "permanent," the court noted that it would terminate the guardianship in the future if Mother became a fit parent pursuant to its authority under Wyo. Stat. Ann. § 3-3-1101(a)(v), which provides that a guardianship may be terminated if the court determines that it is no longer necessary. In consideration of this authority, the court stated that it would "review the guardianship appointment in six months if requested to do so by any party." Finally, the court concluded by noting the possibility that Mother could be rehabilitated:

> The Court urges [Mother] to work with L.N.P.'s therapists to develop an understanding of her needs and to thereby achieve fitness and remove the currently existing risk of serious emotional harm. The Court also admonishes the Petitioners that if this were a child protection proceeding, the working permanency plan would in all likelihood be family reunification of L.N.P. with her natural mother, and that they should not confuse these proceedings with those necessary to terminate parental rights. Both Wyoming law and the ICWA contemplate that a guardianship under these circumstances should continue only so long as necessary to prevent further

harm to L.N.P., and that the guardianship must end if there is no longer risk of serious emotional harm.

Based upon the foregoing, we do not find reversible error.

[¶33] Affirmed.